## The Courier Journal Company v. Phillips.

### (Decided February 21, 1911.)

### Appeal from Powell Circuit Court.

1. Newspaper Publication—Action Against Paper for Libel—Establishment of Truth of Matter—Complete Defense.—In an action against a newspaper for an alleged libelous publication, the establishment of the truth of the matter complained of is a complete defense.

2. Good Faith of Publication—Substantially True—Peremptory Instruction.—Where the article complained of was published in good faith and with the belief that it was true, and the evidence showed it to be substantially true, the defense was complete, and the plaintiff was entitled to a peremptory instruction.

JOUETT & JOUETT, BENNETT H. YOUNG and JOHN D. ATKINSON for appellant.

C. F. SPENCER and HAZELRIGG & HAZELRIGG for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

The Louisville Courier Journal, in its issue of April 12, 1908, published the following article:

"CALLS 'COUNTERFEITER' AND ATTRACTS CROWD WHICH JOINS INTENSELY EXCITING HUE AND CRY.

---

"Gus Neurath Says He Saw Man Pass
Counterfeit Money—Fugitives Run
Into Arms of Police.

" 'Stop, counterfeiter!' shouted Gus Neurath, Bailiff of the City Court in stentorian tones at Fifth and Jefferson streets shortly after ten o'clock last night. Two hundred people, including the bailiff, two lieutenants of police and a little man, who was always in front and repeatedly turned upon and slapped by the objects of the chase, pursued two men from Fifth and Jefferson

Streets to Sixth Street and Congress Alley. When it was all over M. A. Phillips, of Stanton, Ky., was arrested on charge of passing counterfeit money and carrying concealed a deadly weapon; his nephew, Samuel Scott, on a charge of suspected felony; and the little man clamoring for an action at law for his slaps.

"The trouble had started in Weyler & Kurz saloon, at Fifth and Jefferson Streets. Neurath chanced to stop there with several friends and was invited by Phillips to take a drink at his expense. Neurath says that he noticed that the dollar bill which Phillips put on the counter in payment for the drinks was a counterfeit. He accordingly swallowed the treat, but not the alleged transgression. Scarcely had Phillips and Scott, who was with him, left the saloon when Neurath informed the bartender of the alleged counterfeit and left the saloon in pursuit, summoning all the counterfeiters within the radius of his 'bailiff's' voice to halt under penalty of the law. Phillips and Scott immediately took to their heels, with a crowd that grew in a twinkling to 200, after them. A little man who gave his name as S. H. Gills, led the chase. Whenever he came close enough to the fugitives he was slapped in the face, he said, and fell back a few yards.

"The hue and cry came down Jefferson Street and in Sixth Street, rousing from their desks at Central Police station Lieuts. Doran and Wehrle, who had just been lamenting the dullness of the night and hoping that Ki Ki the desperate, would come in their direction. Two seconds later the two lieutenants, both coatless and portly, were vying with each other in vaulting the railing in front of the station. A moment later they had stopped and arrested the two fugitives, with the slapped and clamorous Gills joining them at the triumphal finish.

"Phillips admitted having passed the dollar bill in question, but declared that he had done so unaware of its questionable character, having himself received it at Lexington. He declared that he was a lawyer and that he lived in Stanton, Ky. When arrested he had a revolver in his possession. Scott, whose home is said to be in Mt. Sterling, was held on charge of suspected felony. He says that he was merely accompanying Phillips and denies the charge against him."

Conceiving that a wrong had been done him by reason of this publication, M. A. Phillips brought suit in the Powell Circuit Court against the paper for libel. Upon motion, all of the printed article was stricken out except the following:

"CALLS 'COUNTERFEITER' AND ATTRACTS
CROWD WHICH JOINS INTENSELY
EXCITING HUE AND CRY.

"Gus Neurath Says He Saw Man Pass Coun-
terfeit Money.—Fugitives Ran Into
Arms of Police.

" 'Stop Counterfeiter', shouts Gus Neurath, Bailiff
of City Court, in stentorian tones at Fifth and Jeffer-
son Streets shortly after ten o'clock last night. When
it was all over, M. A. Phillips of Stanton, Kentucky,
was arrested on charges of 'passing counterfeit money'
and 'carrying concealed a deadly weapon.'

The defendant answered, and, for defense, pleaded
the truth of the publication. On this issue the case was
tried out before a jury, with the result that plaintiff re-
covered a verdict for $1,500. The paper appeals.

Three grounds are relied upon for reversal; first,
error in not instructing the jury peremptorily to find for
the defendant; second, misconduct of plaintiff during
the trial; and, third, that the verdict is excessive.

The facts, as developed by the testimony, are as fol-
lows: Plaintiff, who lived in Stanton, Kentucky, had
gone to Louisville to assist his son out of some
character of trouble in which he had become involved
on account of a strike among the employes of the street
car company. He had been in Louisville several days,
and, on the night before the publication complained of,
in company with a relative named Scott, went into a
saloon, and there met Gus Neurath, bailiff of the City
Court, whom he asked to join them in a drink. The
drinks were served, and plaintiff tendered in payment
what appeared to be a silver dollar. The necessary
change was given him, and he and Scott left. Immediate-
ly that he was gone, Neurath asked the barkeeper to
let him see the dollar given him by plaintiff. When it
was exhibited he pronounced it a counterfeit. Thereupon
he summoned a man named Hart to assist him, and to-
gether they went in search of plaintiff and Scott. They
found them in a lodging house not far away, and call-
ing them out, Neurath told plaintiff that they were
wanted for passing counterfeit money. Plaintiff assur-
ed the officer that if it was counterfeit it was a mistake
and that he would rectify it. But despite his protests, as
well as those of Scott, they were started down the street
toward the station house. After going a short distance,
Scott broke away from Hart and ran down the street,

pursued by Hart and several others, who were attracted by the shout of Neurath, "Stop counterfeiter!" or "Stop counterfeiters!" Neurath says that at the same time plaintive tried to get away from him, but that he grabbed and held him. This plaintiff denies. The shouting and chase attracted quite a crowd, and Scott was soon captured by two police officers into whose arms he ran. Neurath and Phillips caught up with him, and together they were taken to the station house, and the charges of passing counterfeit money and carrying concealed a deadly weapon were placed against plaintiff. A small pistol was found in his hip pocket. Phillips gave bond, and later each charge was dismissed.

By his rulings during the trial and in his instructions the court limited the consideration of the jury to three questions. 1. Was there a cry of "Counterfeiter" made with reference to Phillips? 2. Was a crowd attracted which joined in the hue and cry? 3. Was it true, or substantially true, that the bailiff, Neurath, cried out with reference to Phillips, "Stop Counterfeiter?"

On these pivotal points, appellee testified, as follows: "And about that time Scott broke and ran. I stayed with Neurath and Neurath caught hold of me. * * * I had a little double Derringer pistol in my right hip pocket and he got hold of that; he caught onto it that way indicating) and he held to me. I protested * * * 'By God' he said, 'you have got to go to jail,' and he held on to me."

"Q. Mr. Phillips, is it not true, that at the time you were being held there and Scott ran, that there was a cry of 'Counterfeiter?' "

"A. Yes, sir."

"Q. Was anybody there—was there a crowd?"

"A. I did not see but very few."

"Q. Well, how many?"

"A. Well, I could not see over a dozen people. There was a man by the name of Stringer there who went over to the station and I tried to find him, but can't find him."

Q. Did Gus Neurath cry out 'Counterfeiter?' "

"A. He hollered, 'Counterfeiter' or 'Stop counterfeiter,' or something like that, meaning Scott, they was then after Scott."

Jacob Wehrle testifies to a conversation between Neurath and Phillips at the jail, as follows:

"Q. What passed between him and Neurath?"

"A. He said that Neurath had no right to arrest him. There was some argument about breaking away. Neurath asked him why he wanted to break away."

"Q. What did Phillips say?"

"A. Phillips said he had no warrant; he said 'You had no right to arrest me and that is the reason I wanted to get away. You have no right to arrest me at all.'"

Upon the same point, Robert Donahue testifies:

"Q. Do you know what charge was preferred, against him—what he was arrested for?"

"A. Well, it was about between nine and ten o'clock on Saturday night; I was coming down Jefferson street to the barber shop below Jefferson on Fifth. When I was going in to the barber shop door I heard somebody holler, 'Catch them counterfeiters,' and I seen a man running down there; and I seen some man running up Jefferson street and run in towards Market. Mr. Hart was in behind him. I heard somebody say that the man that Neurath had was trying to get away from him too."

"Q. Did you go back to where he was?"

"A. Yes, sir; and he was trying to get away from Mr. Neurath. They were using some kind of language there. There was such a crowd I could not understand what they were saying; but what attracted my attention was as I was going into the barber shop somebody hollered, 'Catch them counterfeiters.'"

Several other witnesses testified to hearing the bailiff call out "Stop counterfeiter" or "Stop counterfeiters." In answer to the question where he and Hart went with Scott and Phillips after arresting them, Neurath testifies as follows:

"We proceeded from Fifth, we got to Fifth and Jefferson, and Mr. Hart had Mr. Scott and I had hold of Mr. Phillips, of his back pocket this way (indicating). I felt his pistol, a derringer pistol, and I suspected that he would try to hurt us; and I thought Scott might try to get this pistol and I got between them; and when we got nearly to the Willard Hotel on Fifth street he wrenched away from Hart, and about that time Phillips wrenched away from me."

"Q. Did you make any attempt to catch them?"

"A. I did, sir; I said 'Catch them counterfeiters.'"

"Q. Of whom were you speaking when you said 'Catch the counterfeiters?'"

"A. Mr. Phillips and this man Scott."

It will thus be seen that all the witnesses are practically agreed that the bailiff, Neurath, called out "Stop counterfeiter" or "Stop counterfeiters," and the only difference between the testimony of Neurath and Phillips is, that Phillips says that when Neurath cried "stop counterfeiter" he did not refer to him, whereas Neurath says he did. A crowd did gather and join in the pursuit, and Phillips says he was informed that he was arrested for passing counterfeit money; and he admits he had a pistol in his pocket when arrested. Thus, not only is the publication proven to be substantially true, but every material allegation thereof literally true. For, while appellee says that, when Neurath called out "Stop counterfeiter" he meant or referred to Scott, Neurath says he meant appellee, and that at that time appellee also was trying to get away. This appellee denies, but does say that when Scott ran Neurath "caught hold of me" and "held onto me"; and following a statement that Neurath told him with an oath he had to go to jail, said "he held on to me." Wehrle says that, at the jail when Neurath asked appellee why he wanted to break away from him, appellee responded, "because you had no right to arrest me, that is the reason I wanted to get away." Donahue says he heard someone say, about the time that Scott was caught, that "the man that Neurath had was trying to get away from him, too," and that when he went to where Neurath and appellee were "he was trying to get away from Neurath."

When read in the light of the attendant circumstances and the testimony of the witnesses present, we are constrained to accept as true what Neurath says he meant and to whom he referred when he called out "Stop counterfeiter." It was appellee who had given the dollar that was pronounced spurious—it was appellee against whom the charge of passing counterfeit money was preferred; and when one man had escaped and he claims the other was about to do so, Neurath says he meant to stop appellee when he called out "stop counterfeiter." Appellee, of course, cannot know to whom Neurath referred, and his opinion cannot be permitted to weigh against and overthrow the positive testimony of Neurath to the contrary. This is especially so when the veracity and credibility of the witness Neurath are not called in question. The publication did not assert that appellee had passed counterfeit money, or that he

was a counterfeiter, but merely that he was charged with having done so, and that the arresting officer, when he called out "stop counterfeiter," referred to appellee. Appellant assumed the burden of proving that these acts occurred and that these statements were made as published. In our opinion the proof offered fully supports its defense.

The establishment of the truth of the matter complained of as libelous is a complete defense. Cooley on Torts, 3rd ed., p. 416; Townsend on Slander, 306; Malone, etc. v. Carrico, 16 Rep. 155; and Rollins v. Louisville Times Co., 28 Rep., 1054. And where a publication, made in good faith, is shown to be substantially true, there can be no recovery. Vance v. Louisville Courier-Journal Co. 95 Ky. 41; Evening Post. Co. v. Richardson, 113 Ky. 641; and Rollins v. Louisville Times Co., 28 Rep. 1054. Appellant having shown that the report upon which the article was based was furnished by a reliable reporter of long experience, and that it accepted and published the article in good faith as a news item, relying upon its truth and the evidence showing that the article was substantially true, the motion for a peremptory instruction should have been sustained.

Judgment reversed and cause remanded for further proceedings consistent herewith.

Whole court except Judge O'Rear sitting.