## McKINZIE v. HUCKABY et al.
### Civ. No. 5780.

United States District Court
W. D. Oklahoma.
June 2, 1953.

Francis M. Pickel, Jr., Oklahoma City, Okl., for plaintiff.

Butler, Rinehart & Morrison, Oklahoma City, Okl., and McLaury & McLaury, Snyder, Okl., for defendants.

WALLACE, District Judge.

The plaintiff, Pauline McKinzie, brings this action against T. C. Huckaby and The First National Bank, Snyder, Oklahoma, to recover $5 for medical expenses incurred, $30 for loss of time, $50,000 for slander and loss of reputation and $50,000 exemplary damages, alleging in substance: that de-

fendant Huckaby, as president of the defendant bank came to the town of Mineral Wells, Texas, and brought an armed man into the place of business where the plaintiff was employed; that Huckaby then and there accused plaintiff of removing a mortgaged car across the State line and of disposing of the same without the permission of the mortgagee; that Huckaby stated in the most belligerent tones that he was the owner of a mortgage of record on said car and that he had come for the car; that the threats and intimidating actions of the armed man, represented by Huckaby to be a local policeman of the town of Snyder, Oklahoma, so distracted the plaintiff that she became nervous and upset and ill; that the slanderous remarks of the defendant. Huckaby in the presence of her employer and co-workers "has created a doubt in their mind and has further acted upon the nervous system of the plaintiff"; that Huckaby further stated he intended to take everything that she owned or hoped to own and "that he would give the plaintiff one week and he would come for everything"; that although the plaintiff at one time did owe a sum of money to "The Planters State Bank" at Mountain Park, Oklahoma [the defendant bank's legal predecessor] secured by a mortgage on a 1947 Chrysler that this note and mortgage had been paid in full.

The defendants, after taking the plaintiff's deposition, have moved for summary judgment in their favor under Rule 56.[1]

Unquestionably, the complaint as drawn states a cause of action against the defendants.

However, plaintiff in her desposition in describing the occurrences pertaining to this case testified:[2]

[1] Fed.Rules Civ.Proc. rule 56, 28 U.S.C.A. Section (c) provides: "The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. * * *"

The motion in question was filed May 6, 1953, and set for hearing on May 15, 1953. Although the hearing was not set 10 full days from the date the motion was served, attorney for plaintiff appeared and designated he was fully prepared to contest the motion. This provision for 10 days notice is not jurisdictional and can be waived by the parties.

[2] Deposition of Pauline McKinzie Taken on Behalf of Defendants, April 10, 1953, pp. 41, 42, 43.

644

"Q. All right. Where did you see him [Huckaby] and what did he say to you and what did you say to him? A. He came into my place where I work about 15 minutes until 12:00 or 10 minutes until 12:00, something like that, and when I saw him come in, all of the men were there, and I didn't want to say anything and I just told him I would see him at 12:00, and he could just wait in front on me, so when I went out to get in the car, I got in his car and sat in the back, and he had Ed Killingsworth, the law in Snyder, with him. Of course, I was scared to death. I didn't know what the deal was as I thought everything was settled, and I was to send him the money, you know, and I didn't even dream about him coming down there because it had not been but about four or five days since I got a letter, and it did kind of just tear me all to pieces. When I saw the policeman, I did go all to pieces. I just couldn't talk.

"When I got in the car, I said, 'Mr. Huckaby, why don't you go up to Oklahoma City and see Dudley? [plaintiff's husband] I have done all I am going to do. I can pay you this much. I was going to send this to you but I can pay you this $50 and I can proceed to draw my check and pay you $25 more, which would pay it up ahead of time, and he said 'I don't want the money. I want the car or all of the money', pertaining to my car. He said 'Where is your car?' I said, 'It is sitting across over there.'

"I asked him to come out to my house and I would show him the chattel mortgage, and I wanted to know why he was there and find out what he wanted me to do about it, since we had made that agreement.

"When I came back out to the car, the policeman was standing by the side of the car and I didn't know what they were going to do with me.

"Q. Pardon me. Was this downtown or at your home? A. That was out at my home.

"Q. All right, go ahead. A. So, after I showed him these papers and my chattel mortgage and everything and told him I had called Dudley and he had told me to go ahead and pay him that, he said, 'I just won't accept it.' He said that to me two or three times. He looked at my chattel mortgage and papers and then he handed them over to the policeman and let him see them and they handed them back to me. I just sat there and he turned around and said to me 'Mrs. McKinzie why have you been stringing me along like this?' I said, 'What do you mean, Mr. Huckaby?' Of course, I was crying and he said, 'Well, I will give you one week from today.' That was on Tuesday. 'Next Tuesday, I have got to have the money or I have got to have the car, one or the other.'

"That was the last I heard of it.

"Q. Now, that was out in front of your house? A. Yes, sir; right in my driveway.

"Q. Then, did they take you back to your work? A. No, sir; they taken me down in front of the gas company and let me out and I walked back across there and got in my car and went home.

"Q. You got in their car at your house? A. Yes, sir.

"Q. (Continuing) And came down to the gas company with them? A. Yes, sir."

This and other portions of the plaintiff's deposition together with stipulations by counsel indicate the following significant variances between the allegations in the complaint and the undisputed facts:

1. Huckaby came *alone* into the place of business where plaintiff worked and he did so in a nonbelligerent manner; the uniniformed policeman remained in Huckaby's car out in front unidentified.

2. No commotion or stir was created by Huckaby in the presence of the plaintiff's employer or plaintiff's fellow employees; and, upon request by the plaintiff Huckaby waited out in front in his car.

3. The plaintiff got into Huckaby's car to talk with him of her own volition; at such time the plaintiff recognized Huckaby's companion to be a policeman from Snyder and she became emotionally upset.

4. Plaintiff owed the bank an unpaid balance and had disposed of the mortgaged automobile.

The hearing indicated further that Huckaby drove the plaintiff out to her house at her own request to enable the plaintiff to obtain certain papers with which she hoped to convince Huckaby that the mortgage in question had been satisfied and released. Thereafter the plaintiff was driven back to town at her own request and was let out of the car at a place of her own choosing.

█ Clearly, the Rule permitting summary judgment was not intended to cut off a right of trial by jury where there are contested issues to try and summary judgment should be granted only when the moving party is entitled to judgment as a matter of law where the truth is quite clear and where no genuine issues remained for trial.[3]

The Court has carefully considered the uncontested facts in the instance case and is of the opinion that under no theory of law is the plaintiff entitled to recover in this action.

█ Under these facts no action for libel or slander could possibly lie for two reasons: (1) The remarks made by Huckaby were true (2) The remarks were not made within hearing distance of third persons, in this case, within hearing distance of the plaintiff's employer or fellow employees.[4] In addition, there is a very serious question whether the remarks even if published could be considered of a slanderous character.[5]

█ Although the complaint is framed fundamentally along the line of slander or libel, the Court has also considered whether, under the undisputed facts, there could have been an "invasion of the plaintiff's right of privacy." Naturally, if such invasion took place *truth* is no defense.[6]

However, the facts do not support an action upon the theory of invasion of right of privacy. If the defendant Huckaby had taken a companion, known and recognized by all as a police officer, into the place where the plaintiff worked or in any other way used an officer to publicly embarrass and coerce the plaintiff such could well constitute a violation of plaintiff's privacy; the situation would be somewhat analogous to an unwarranted advertising or publishing that a debt is owed.[7]

Where as here the policeman remained in the car in front unidentified to all except

3. Chappell v. Goltsman, 5 Cir., 1950, 186 F.2d 215.

4. If the employer and employees of plaintiff learned the essence of this conversation they learned of such from the plaintiff herself; consequently, the plaintiff has no cause for complaint.

5. 33 Am.Jur. § 60, p. 78, provides in part: "As respects a charge of failure to pay debts, without any imputation of insolvency, it seems to be settled that a writing containing the mere statement that a person who is not a trader or a merchant, or engaged in any vocation wherein credit is necessary for the proper and effectual conduct of his business, owes a debt and refuses to pay, or owes a debt which is long past due, is not libelous per se and does not render the author or publisher of such statement liable without proof of special damages. *Such a statement does not in a legal sense necessarily expose the person of whom it is said to public hatred, contempt, or ridicule, nor does it degrade*

*him in society, lessen him in public esteem, or lower him in the confidence of the community.*" (Emphasis supplied.)

6. Although truth is a defense to an action for libel or slander, it is not a defense to an action for an invasion of the right of privacy. See Brents v. Morgan, 1927, 221 Ky. 765, 299 S.W. 967, 55 A.L.R. 964; Themo v. New England Newspaper Pub. Co., 1940, 306 Mass. 54, 27 N.E.2d 753. Also, see 4 Harvard L.Rev. 218.

7. Recovery has been permitted in several cases where the creditor oppressively dealt with the debtor in order to collect the debt. See 138 A.L.R. 91.

In Brents v. Morgan, ibid, the defendant, an automobile garage owner, attempted to collect a bill owed by plaintiff by placing a large sign in the window of his garage stating, that if promises would pay an account, the plaintiff's account would have been paid long ago, and closing with the warning that the account would remain advertised so long as it remained unpaid. The court permitted the

the plaintiff who recognized Huckaby's companion as a police officer from Snyder, at the time she entered Huckaby's car voluntarily, no invasion of privacy has taken place.

Although the officer did get out and stand by the car with a gun strapped to his side[8] while the plaintiff went into her home to obtain certain papers, this could not constitute an unlawful invasion inasmuch as the plaintiff requested Huckaby to drive her home; consequently, any embarrassment, if any, which arose due to this visit was brought on directly by the plaintiff due to her own specific request.

A creditor has the right to take reasonable steps to collect a delinquent debt.[9] As stated in section 312 of the Restatement, Torts:

"If the actor intentionally and unreasonably subjects another to emotional distress which he should recognize as likely to result in illness or other bodily harm, he is subject to liability to the other for any illness or other bodily harm of which the distress is a legal cause, (a) although the actor has no intention of inflicting such harm, and (b) irrespective of whether the act is directed against the other or a third person."

Comment C goes on to say:

"Where, however, the distress is likely to be physically harmful only to a person who has a peculiar sensibility to emotional strain which is not characteristic of any substantial minority of women or men the actor is not subject to liability under the rule stated in this Section unless he knows or from facts known to him should realize that the other has or may have such a peculiarity."

From the undisputed facts all reasonable men could but agree that the conduct of defendant Huckaby was not unreasonable and *if* the plaintiff suffered any harmful effect she did so due to having "a peculiar sensibility to emotional strain which is not characteristic of any substantial minority of women or men".

The defendants' motion for summary judgment is hereby sustained.

A suitable journal entry should be submitted to the Court by counsel within ten days.

plaintiff to recover upon the theory that this publication invaded plaintiff's right of privacy and that the truth of the publication was no defense. Also, see Trammel v. Citizens News Co., 1941, 285 Ky. 529, 148 S.W.2d 708; Cf. La Salle Extension University v. Fogarty, 1934, 126 Neb. 457, 253 N.W. 424, 91 A.L.R. 1491.

8. The companion of Huckaby, Ed Killingsworth, made an affidavit which was attached to defendant's motion for summary judgment, in which he stated among other things that, he accompanied Huckaby to Mineral Wells, Texas, to drive an automobile back upon which the bank had a mortgage; and, that he did not take part in the discussion, and he did not have or exhibit any gun or firearms. However, for the purpose of ruling upon this motion the plaintiff's statement as to the gun must be taken as true.

9. See McCravy v. Schneer's, 1933, 47 Ga. App. 703, 171 S.E. 391.